## CHRIS S. LARSON AND ANOTHER v. ARCHER-DANIELS-MIDLAND COMPANY, INC.[1]

May 21, 1948.

No. 34,651.

[1]Reported in 32 N. W. (2d) 649.

*Hall & Forbes,* for appellant.
*Ostensoe & Ostensoe,* for respondents.

FRANK T. GALLAGHER, JUSTICE.

Appeal by defendant from a judgment of the district court. The action was for alleged conversion of flax straw grown upon plaintiffs' farm during the years 1941, 1942, 1944, 1945, and 1946. Whether there was a conversion as claimed depends upon whether plaintiffs had title to the flax straw at the times of the alleged conversions, and that question in turn depends upon the relationship which existed between plaintiffs, Chris S. Larson and Martin Larson, as owners of the land upon which the flax was grown, and one Clifford Gaard, their brother-in-law, who was in possession of and worked the farm under an oral agreement with plaintiffs. Defendant is a corporation engaged in processing flax straw into materials and fabrics. During the years 1942 to 1946, inclusive, with the exception of the year 1943, defendant purchased straw from Gaard valued at $246.89. Defendant contends that the relationship between plaintiffs and Gaard was that of landlord and tenant, and that Gaard therefore had title to the straw at the times he sold it to defendant. Plaintiffs claim that the relationship between them and Gaard was one of tenancy in common, under which plaintiffs had legal title to at least one-half the straw. The court found that the plaintiffs and Gaard entered into an oral agreement whereby the latter was to work plaintiffs' land for the consideration of one-half of everything raised thereon, and also pay cash for hay land and fodder corn; that during the period of the oral lease certain amounts of flax straw, of a total value of $246.89, were raised and harvested on the premises, of which amount one-half belonged to Gaard and one-half to the owners; that Gaard, without authority or consent of the owners,

sold all the flax straw involved to defendant, and received payment therefor; that plaintiffs made due and repeated demands upon defendant and its agents for their share of the straw or its value, but that defendant failed either to deliver the straw or pay plaintiffs for it; that before defendant purchased the straw plaintiffs notified it of their ownership. The court concluded that plaintiffs owned and were entitled to the immediate possession of one-half of the straw or its value, in the sum of $123.44, and that there was a conversion of plaintiffs' share of the straw by defendant. In a note to its conclusions of law, the court stated that in its opinion it was unimportant whether plaintiffs and Gaard were tenants in common or landlord and tenant, since defendant had ample notice of the claim of plaintiffs that they owned the straw.

The two essentials of a cause of action for conversion are property in the plaintiff, either general or special, and a conversion by defendant. 2 Dunnell, Dig. & Supp. § 1937. Conversion has been defined as an act of wilful interference with a chattel, done without lawful justification, by which any person entitled thereto is deprived of use and possession. Prosser, Torts, 95.

Unless plaintiffs had title to the flax straw under their oral agreement with Gaard, their action must fail, for it is obvious that such title could not have been acquired by a mere claim of ownership made to defendant. As a general rule, the intent, knowledge, or motive of the converter is immaterial except as affecting damages. 2 Dunnell, Dig. & Supp. § 1928; 53 Am. Jur., Trover and Conversion, § 58. The effect of the notice referred to herein would be to preclude application of the rule that conversion does not lie where the taking is with the knowledge and consent of the owner. The factor of notice, then, as going to the issue of good faith, could be material only on the issue of damages, and even in that regard this court has said that actual notice of the adverse claim of the rightful owner is not necessarily inconsistent with honesty of intention. Whitney v. Huntington, 37 Minn. 197, 33 N. W. 561; King v. Merriman, 38 Minn. 47, 35 N. W. 570.

We proceed, therefore, to a determination of the issue of whether title to the flax straw at the times of the alleged conversions was in plaintiffs and Gaard as tenants in common or in Gaard as a tenant under a landlord-and-tenant relationship. Under an oral agreement made in the fall of 1938, plaintiffs and Gaard agreed that Gaard should assume exclusive possession of a certain quarter section of land owned by plaintiffs in Lincoln county, Minnesota, and farm the same, with one-half share of the grain and corn raised each year going to plaintiffs. In addition, under the agreement, Gaard was to pay plaintiffs four dollars per acre for alfalfa, fodder corn, and pasture acreage, and one dollar per acre for hay land. There was no agreement regarding the flax straw.

There is a conflict in the cases as to construction of contracts between the owner and occupant of land for its cultivation on a share basis and as to the rights of the owner and the occupant in the land and in the crops. In Strangeway v. Eisenman, 68 Minn. 395, 398, 71 N. W. 617, 618, decided in 1897, Mr. Justice Mitchell said:

"* * * No general rule can be laid down, applicable to all cases of agreements of this kind, because the precise nature of the interest or title between the contracting parties *is largely a question of their intention, as expressed in the language they have used,* and hence must depend upon the particular provisions of the contract itself. But it may be stated generally that the present tendency of the authorities is to hold that whenever there is a provision, in whatever form, for dividing the specific products of the premises, a tenancy in common arises in the products which are to be divided." (Italics supplied.)

The question of the construction of the relationship created by a contract to farm on shares is discussed in 15 Am. Jur., Crops, § 48, which states:

"* * * The general rule is that the question whether the relation of the parties is that of landlord and tenant, landowner and cropper, participants in a common venture, or some other relationship must

turn upon the actual intention of the parties as gathered from the entire contract, the language in which it is cast, and the circumstances surrounding its execution. If the import of the agreement is doubtful, the actions of the parties to it may furnish a satisfactory guide for its interpretation."

The matter of the intention of the parties appears to prevail in all cases brought to our attention. In the case of Mutual Benefit L. Ins. Co. v. Canby Inv. Co. 190 Minn. 144, 149, 251 N. W. 129, 132, this court, under the facts there, said that "it appears certain that the parties intended that the relationship of landlord and tenant should exist."

The contending parties have advanced strong arguments in their respective briefs. We have scrutinized the testimony of the only witnesses in the case, namely, Chris S. Larson, one of the owners, and Clifford Gaard, the tenant, to ascertain what was the intention of the parties to the oral agreement. Larson said he regarded Gaard as his tenant. When asked on direct examination as to the terms of the lease, he testified:

"Q. Tell us just when Mr. Gaard went on your place * * * with the intention of renting from you what was the conversation between you and Mr. Gaard as to the terms of the lease?

"A. Well, that was on a half and half basis.

*     *     *     *     *

"A. * * * half of everything. Grain and straw wasn't mentioned but he paid half of the thrash bill and half of the twine and I paid half."

Questioned on cross-examination as to the contract relationship between Gaard and the owners, Larson testified:

"Q. You figured you were in a landlord and tenant relationship?

"A. Yes.

"Q. And what he paid you was rent?

"A. Yes, with the cash rent.

"Q. A share of the grain he gave you and with the cash rent was rent to you—paid to you?

"A. Yes."

There was some conflict in the testimony as to when Gaard moved onto the farm. Larson thought it was about March 1, 1940, while Gaard said March 2, 1939. With reference to the tenancy, Larson testified:

"Q. In your own mind now, in your own understanding of this matter, was he in there for a year then as a tenant of yours?

"A. Yes.

"Q. You consider all the rest of the time he was in there as a tenant from year to year?

"A. Yes, he was a tenant from year to year.

"Q. That was your agreement with him?

"A. Yes.

\* \* \* \* \*

"Q. But that was your understanding of the matter—he was a tenant from year to year, from approximately March 1st to March 1st?

"A. Yes.

\* \* \* \* \*

"Q. But the agreement you had you considered a rental agreement?

"A. Yes.

"Q. If at any time during one of the years from March 15th to March 15th or March 1st to 1st you had wanted Mr. Gaard to get off would you have considered March 1st the end of his term if you had wanted to ask him to leave?

"A. Well, he just started farming another year and didn't ask if he could stay or not.

"Q. But you considered him a year to year tenant?

"A. Yes.

"Q. My question was that if you had wanted to during that period you figure in your own mind you could have told him before March 1st and had him move off—his term was up each March 1st, wasn't it?

"A. Yes."

With reference to possession, Larson testified:

"Q. Now, during the time of his tenancy each one of these cropping years did you regard him as being in exclusive possession of the land?

"A. Yes..

\* \* \* \* \*

"Q. But Clifford Gaard, as your tenant, had exclusive possession and use of the land during each one of the cropping years?

"A. Yes."

When asked about the rent, Larson testified:

"Q. Now, these payments that were made to you as cash rent, how much were they?

"A. Well, it was alfalfa at $4.00 an acre and some hay land at a dollar an acre and for corn and such things $4.00 an acre.

"Q. And the rest of your rent was paid in a share of the grain?

"A. Yes, half and half.

\* \* \* \* \*

"Q. And that was, as you understand it, rent payments to you?

"A. Yes.

\* \* \* \* \*

"Q. He was always your tenant?

"A. Yes.

"Q. It is your position at the present time then that you should have the money for half of the flax straw?

"A. Yes.

\* \* \* \* \*

"Q. \* \* \* Does Mr. Gaard owe you any money?

"A. Well, I got the money coming from the straw. The one that bought it, I suppose, should pay me.

"Q. Well, does he owe you any money then?

"A. Well, in a way, between the company [defendant] and Gaard, I suppose. They are the ones that had the deal about it.

\* \* \* \* \*

"Q. And Gaard owes you nothing?

"A. Only this flax straw."

With reference to repairs on the premises, Larson testified that Gaard fixed some of the fences and the owners also fixed some during the times involved. Larson further testified:

"Q. You, in your own mind, have never contemplated the situation that you were hiring Gaard out there on the farm to work for you?

"A. No."

There is nothing in the record with reference to whether Gaard ever sublet or had the right to sublet any part of the premises, but the fact that the owners regarded Gaard as in exclusive possession of the premises during his tenancy would indicate that they did not contemplate any subletting by the renter.

Referring now to Gaard's understanding of the matter, he said that he moved onto the farm March 2, 1939, and vacated it December 1, 1946. He testified that at no time did he have a written lease with plaintiffs, but only an oral agreement, and that they had no agreement about the flax straw.

"Q. What were the terms of that oral agreement?

"A. It was half of the grain and corn and $4.00 an acre for cash rent.

"Q. Each year of your tenancy did you pay half of the grain over to Mr. Larson?

"A. Yes.

"Q. You paid your cash rent?

"A. Yes."

When asked if he made rent settlements with the owners at the end of each crop season, Gaard said, "I paid so much," and that they finally settled in 1946, "when we cleaned everything up and got it all straightened around." He claimed that the first time Larson ever requested him to pay over part of the money received for the flax straw was in November 1946, but Larson testified that he had asked

Gaard for this money several times before that time, as well as in the fall of 1946.

Following the rule that the intention of the parties governs, this court, in construing a written instrument to be a lease, said in State ex rel. Gillilian v. Municipal Court, 123 Minn. 377, 380, 143 N. W. 978, 979:

"* * * It is well settled * * * that a contract to cultivate land on shares may be a lease. * * * The intent of the parties governs. It is usually held that where the cropper has possession exclusive of the owner, this is conclusive of the relation of landlord and tenant. * * * Provisions for a fixed term * * *, provisions to give up possession at the end of the term * * *, provisions against underletting, and provisions to keep the improvements on the premises in repair * * * are all of them important indications of an intent to create the relation of landlord and tenant."

In Mutual Benefit L. Ins. Co. v. Canby Inv. Co. 190 Minn. 144, 251 N. W. 129, *supra,* the defendant Canby Investment Company was the owner and mortgagor of a certain tract of land, which mortgage was held by plaintiff. Under the terms of the mortgage, the Canby company was to pay taxes, insurance, etc., and to keep the premises in good repair. The mortgage further provided that if the mortgagor failed to do so the mortgagee should be entitled to receipts for any rents due from any tenant on the premises and apply the same to the payment of taxes, etc. The Canby company leased the premises to defendant Kosberg and agreed to take as rent therefor a one-half share of all grains and vegetables and four dollars per acre for hay, pasture, and corn land. The Canby company failed to pay the taxes for the year in question. Plaintiff paid the same and commenced this action to replevy from defendant Kosberg the share of grain he owed the Canby company, and to have judgment for the cash rent defendant Kosberg owed the Canby company. Both defendants contended that under the above-mentioned farm contract they were joint adventurers, that they were tenants in common of the grain in question, and that therefore there was no rent to which this

clause in the mortgage assigning the rents could fasten itself or could apply. This court held that the relationship between the two defendants was not that of joint adventurers, but that of landlord and tenant, and hence that there was no tenancy in common of the crops. In construing the contract, the court said that it appeared certain that the parties intended that the relationship of landlord and tenant should exist, as it could come to no other conclusion from the language of the instrument and the provisions embodied therein. The court then set out the provisions which brought it to this conclusion, by calling attention to the fact (1) that the instrument purported to remise, lease, and let the land; (2) that the premises were referred to as leased premises; (3) that one party was denominated as lessor and the other as lessee; (4) that defendant Kosberg agreed to pay cash and a share of the grain as rent; (5) that the Canby company was allowed to reënter and take possession of the premises upon the happening of certain contingencies; and (6) that the duration of the contract was referred to as the term of the lease.

Plaintiffs attempt to distinguish the Mutual Benefit case from the instant case on the grounds that there the agreement was in writing and contained a chattel mortgage on the crops in favor of the owner, while here the agreement was oral and contained no chattel mortgage. They claim that in taking back a chattel mortgage in the Mutual Benefit case the owners admitted an exclusive property right and title in the crops in the tenant. We believe that neither of the stated grounds of distinction is sufficient. While the terms of an oral agreement are more difficult to prove, once its terms are established they are as binding as the terms of a written agreement. While it is true that the court in the Mutual Benefit case relied somewhat upon the fact that there the agreement contained a chattel mortgage, we do not believe from the language of the decision as a whole that the presence of the chattel mortgage was the critical or determining factor in the case. We believe, rather, that the court there relied on the mortgage provision to buttress the conclusion it had reached on the basis of the other indicia of the landlord-tenant relationship which were present in that case.

Plaintiffs also cite in their behalf the cases of Strangeway v. Eisenman, 68 Minn. 395, 71 N. W. 617, and Northness v. Hillestad, 87 Minn. 304, 91 N. W. 1112. In the Strangeway case, the owner and tenant entered into a written contract covering the land and for the raising of certain livestock on a share basis. The tenant was to till the land, furnish all teams, implements, and labor necessary, and keep all buildings in repair, while the owner was to furnish all seed and pay one-half the threshing bill. Other arrangements in the agreement provided for the care of livestock. The contract further provided that until a division was made title and possession of all crops and stock on the premises was to remain in the landowner. In that case, it did not appear that the tenant was in default in any of the terms of the contract, but, even so, the owner brought an action to recover possession of all the crop raised on the land during the year in question before the work of harvesting and threshing the crops was completed by the tenant. The agreement was construed by the court to create a relationship of tenants in common in the crops as between the owner and tenant, and the only effect given the provision in the contract as to title and possession of the crops in the owner until division was to consider the owner as holding the same as security for performance by the tenant. It was held that the owner had no right to take possession of the crop from the tenant, who was not in default, as the latter had the right under the circumstances to possession of the crops for the purpose of completing the work of harvesting and threshing, which he was required to do under the terms of the contract. The facts in that case are entirely different from those in the case at bar, where Gaard at all times had exclusive possession of the farm and control of the crops.

The other case cited by plaintiffs (Northness v. Hillestad, 87 Minn. 304, 91 N. W. 1112) was an action to recover the proceeds of certain crops raised by plaintiffs (renters) under a written agreement with the owner of the land, whereby the renters were to till and cultivate the land. The contract was the ordinary farm agreement in use in the state at that time, whereby one-half of all grain and crops raised became the property of the renter upon full compliance with

the terms of the agreement, and the title to the crops remained in the owner as security for the performance of the agreement until the renter performed his part of the agreement and a division of the crops was made. In that case, the owner took possession of the crops at the close of the crop season and sold them. Plaintiffs sued to recover their share of the receipts from the crops sold, less certain deductions for indebtedness owed by them to the owner. It was held that the owner was liable to the renters for their share, as plaintiffs had a right to recover either for conversion or for money had and received. The court said that the parties were jointly interested in the contract and were joint owners of the crops raised thereunder. The facts there differ again from those here, in that in the Northness case the court conceded that under the terms and conditions of the contract between the parties the title to the crops remained in the landowner as security for the performance of the contract agreement until full compliance by the renters with the terms and conditions of the agreement. Here, there was no agreement which gave title to the owners until a division of the crops, as it clearly appears from the record that the relationship of landlord and tenant existed between the parties.

While we recognize that the use of such a legal term as "landlord and tenant" by a witness would not necessarily control its legal definition, we conclude from a review of the testimony involving the manner in which Gaard operated plaintiffs' premises during his occupancy, his exclusive possession, his term from year to year, the rights of the owners to terminate the lease at the end of any contract year, the provisions for the payment of part of the rent in crops and part in cash, and other facts and circumstances that it was the intention of the parties in the instant case that the relationship of landlord and tenant should exist rather than that of tenants in common or joint adventurers. It is our opinion that at the times herein considered the title to the crops, including the flax straw, was in Gaard, the tenant. Therefore plaintiffs, lacking title to the straw at the times of the alleged conversions, cannot maintain an action therefor against defendant. Any claims of

plaintiffs for half the value of the flax straw as rent during the years of the tenancy agreement with Gaard would have to be asserted as against Gaard.

Reversed.

MR. JUSTICE KNUTSON, not having been a member of the court at the time of the argument, took no part in the consideration or decision of this case.

